# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-21-00111-CV
---

**Conagra Brands, Inc., Appellant**

**v.**

**Glenn Hegar, Comptroller of Public Accounts of The State of Texas; and
Ken Paxton, Attorney General of The State of Texas, Appellees**

---
### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-007155, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING
---

## M E M O R A N D U M   O P I N I O N

Conagra Brands, Inc. (Conagra) appeals from the trial court's judgment in favor of Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas (collectively, "the Comptroller") in its franchise-tax protest suit. The issue in this appeal is whether the gross proceeds or the net proceeds from sales of commodity futures contracts and options on commodity futures contracts should be included in the apportionment factor denominator used to calculate Conagra's apportioned margin for franchise tax purposes. *See* Tex. Tax Code § 171.106 (how to calculate apportionment factor). The trial court determined that only the net proceeds could be included in the calculation of Conagra's apportionment factor and, consequently, Conagra was not entitled to a refund of franchise taxes paid for report years 2011 through 2014. The trial court rendered judgment that Conagra take nothing in its franchise-tax protest suit. We will affirm.

**BACKGROUND**

Texas imposes a franchise tax on businesses based or operating in the state. *See id.* § 171.001. In its simplest form, franchise-tax liability is calculated by multiplying a business's taxable margin by the applicable franchise tax rate. *See id.* § 171.002. Taxable margin is determined by multiplying a business's total margin by an apportionment factor designed to limit the franchise tax to revenue attributable to business conducted in Texas. *See id.* § 171.101. The apportionment factor's numerator consists of receipts from business conducted in Texas and the denominator consists of receipts from business conducted anywhere, including Texas. *See id.* § 171.106(a). Under this formula, franchise-tax liability increases as the ratio of Texas receipts to total receipts increases. The Texas Supreme Court has explained:

> If the numerator (Texas receipts) increases but the denominator (all receipts) stays the same, receipts from Texas business make up a larger share of total receipts and franchise-tax liability increases. If, on the other hand, the numerator decreases against the same denominator, receipts from Texas business make up a lesser share of total receipts, and franchise-tax liability decreases.

*Hallmark Mktg. Co. v. Hegar*, 488 S.W.3d 795, 796-97 (Tex. 2016). Similarly, if the numerator (Texas receipts) stays the same but the denominator (all receipts) increases, receipts from Texas business make up a lesser share of total receipts, and franchise-tax liability decreases. Under chapter 171 of the Texas Tax Code, doing more business in Texas generally results in higher franchise taxes. *OGCI Training, Inc. v. Hegar*, No. 03-16-00704-CV, 2017 WL 4899015, at *1 (Tex. App.—Austin Oct. 27, 2017, no pet.) (mem. op.).

The apportionment factor denominator—the taxable entity's gross receipts from business conducted anywhere—is generally composed of the taxpayer's receipts from "(1) each sale of a taxable entity's tangible personal property; (2) each service, rental, or royalty; and

2

(3) other business." Tex. Tax Code § 171.105. However, receipts that are excluded by statute from the taxable entity's total revenue may not be included in a taxpayer's gross receipts for calculation of its apportionment factor. *Id.* § 171.1055(a). Relevant here, Texas Tax Code section 171.1011(g-2) provides that "[a] taxable entity shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), or (c)(3), the tax basis as determined under the Internal Revenue Code of securities and loans sold." *Id.* § 171.1011(g-2).[1] Thus, because it is excluded by statute from a taxable entity's total revenue, the tax basis of securities sold may not be included in the taxpayer's gross receipts for calculation of either the numerator or the denominator of the apportionment factor. *See id.* §§ 171.1011, .1055(a). The result is that only the net proceeds from the sale of loans or securities such as the commodity futures contracts and options on commodity futures contracts at issue in this case are properly included in the apportionment calculation.

Conagra is a packaged food company with operations in Texas. To produce the food products it sells to grocery stores, convenience stores, and food service businesses, Conagra purchases the necessary components and raw materials from its suppliers. These components and materials are sent to manufacturing plants, which create the final products. To manage the risks associated with potential fluctuation in the price of the components and raw materials, Conagra bought and sold commodity futures contracts and options on commodity futures contracts during the franchise tax report years 2011 through 2014. The commodity futures contracts and options on commodity futures contracts that Conagra sold during the 2011 through 2014 report years met the definition of "security" in Texas Tax Code section 171.0001(13-1). *See id.* § 171.0001(13-a). Because the commodity futures contracts and options on commodity

---

[1] The "tax basis" is typically the original purchase price of a security.

3

futures contracts sold during the 2011 through 2014 report years were not purchased or sold to Conagra's customers in the ordinary course of its business, Conagra did not hold these securities as inventory, and we will refer to them as "the non-inventory securities." Conagra bought and sold the non-inventory securities on the New York Mercantile Exchange, the Chicago Board of Trade, the Chicago Mercantile Exchange, the Minneapolis Grain Exchange, and the Kansas City Board of Trade. Each of these exchanges is located outside the State of Texas. For federal income tax purposes, Conagra identified the non-inventory securities as hedging transactions under Internal Revenue Code section 1221(a)(7). *See* 26 U.S.C. § 1221(a)(7) (defining "capital asset" to exclude "any hedging transaction which is clearly identified as such before the close of the day on which it was acquired, originated, or entered into"). Consequently, Conagra reported the gains and losses associated with the non-inventory securities as ordinary under the Internal Revenue Code. On its federal income tax returns for reporting years 2011 through 2014, Conagra reported sales of its food products as inventory sales but did not report sales of the non-inventory securities as inventory sales.

After Conagra had filed its franchise tax returns for report years 2011 through 2014, the Comptroller conducted an audit of those returns. During the course of the audit, Conagra had a tax consultant review its returns. Conagra had not originally included the gross receipts from its sales of non-inventory securities in the denominator of its apportionment factor, but, after reviewing Conagra's returns, the tax consultant requested that the Comptroller's auditor include those gross receipts in the apportionment-factor denominator. Specifically, Conagra sought to increase the denominator by approximately $3.6 billion for tax year 2011, $8.2 billion for tax year 2012, $5.1 billion for tax year 2013, and $5.3 billion for tax year 2014. The inclusion of these amounts would result in a several billion dollar increase in the

4

apportionment-factor denominator for each year, a zero dollar increase in the apportionment-factor numerator for each year, an overall reduction of the apportionment factor for each year, and a concomitant decrease in Conagra's franchise-tax liability of $2.4 million for the five-year period. Conagra calculated that including the gross receipts of its non-inventory securities in the apportionment-factor denominator for all four report years would reduce its franchise-tax liability for those report years by approximately $2.4 million.

The Comptroller's auditor declined to make the adjustment to the apportionment factor Conagra requested. Conagra then requested, and received, an independent audit review conference with a third party identified in trial testimony as "the Comptroller's Chicago office." The reviewer agreed with the Comptroller, after which Conagra requested a hearing before an Administrative Law Judge (ALJ) at the State Office of Administrative Hearings. After the hearing, the ALJ issued a Proposal for Decision that denied Conagra's request for a refund. The Comptroller adopted the ALJ's Proposal for Decision with only minor changes. Conagra then filed suit to recover $2,417,777.84, the amount it claimed constituted an overpayment of taxes for which it was entitled to a refund. *See* Tex. Tax Code § 112.151. Conagra contended that its "everywhere gross receipts for apportionment purposes were understated by the gross sales of securities sold to out of state purchasers that were treated as inventory for federal income tax purposes." The trial court determined that Conagra was not entitled to include the gross proceeds from its sales of non-inventory securities in its apportionment factor for report years 2011 through 2014 and rendered a take-nothing judgment in the Comptroller's favor. The trial court made findings of fact and conclusions of law, and Conagra perfected this appeal. Conagra argues that (1) the trial court erred in concluding that gross proceeds from the sale of the non-inventory securities could not be included in Conagra's apportionment factor denominator for

report years 2011 through 2014 and (2) that the trial court erred in making certain findings regarding the identity of buyers of the non-inventory securities on the various exchanges.[2]

## DISCUSSION

Although usually only the net proceeds from the sale of loans or securities such as the non-inventory securities at issue here are properly included in the apportionment calculation, Conagra sought to include the gross proceeds of those sales for purposes of calculating its apportionment factor for report years 2011 through 2014. In seeking to do so, Conagra relied on Texas Tax Code section 171.106(f), which provides that "[n]otwithstanding section 171.1055, if a loan or security is treated as inventory of the seller for federal income tax purposes, the gross proceeds of the sale of that loan or security are considered gross receipts." *Id.* § 171.106(f). The trial court made the following unchallenged findings of fact regarding the non-inventory securities at issue in this case:

23. Conagra bought and sold [the non-inventory securities] to manage the risk of price changes to the inputs necessary to produce its food product.

24. Conagra did not purchase [the non-inventory securities] from or sell [them] to its customers in the ordinary course of its business.

26. For federal income tax purposes, Conagra identified the [non-inventory securities] as hedging transactions under section 1221(a)(7) of the Internal Revenue Code and reported the gains and losses from [them] as ordinary.

28. The sales of Conagra's food products were reported as sales of inventory on Conagra's consolidated federal income tax returns covering the Period.

---

[2] Conagra asserted that because the commodity exchanges are the buyers and are located outside of Texas, none of the gross receipts from the sale of Conagra's commodity hedges are "sourced in Texas" and, therefore, cannot be included in the apportionment factor as Texas receipts. In its reply brief, Conagra withdrew this challenge to the trial court's findings.

29. The sales of the [non-inventory securities] were not reported as sales of inventory on Conagra's consolidated federal income tax records covering the Period.

30. Conagra's [non-inventory securities] are not merchandise, stock in trade, raw materials, works in process, finished products, or supplies that are physically a part of the food products Conagra sold to its customers.

32. Conagra did not hold its [non-inventory securities] as inventory for federal income tax purposes.

The trial court found, and Conagra does not dispute, that Conagra did not hold the non-inventory securities "as inventory for federal income tax purposes." The trial court also found, and Conagra does not dispute, that Conagra did not buy the non-inventory securities from or sell them to its customers in the ordinary course of its business. This Court has recently held that "[t]he plain language of the statute evidences the legislature's intent for Texas Tax Code Section 171.106(f) to permit the inclusion of gross proceeds from only those securities that the Internal Revenue Code classifies as inventory of the seller." *See Citgo Petroleum Corp. v. Hegar*, 636 S.W.3d 281, 289 (Tex. App.—Austin 2021, pet. filed).[3] Because it is undisputed that the non-inventory securities at issue in this case were not Conagra's inventory as defined by the Internal Revenue Code for federal income tax purposes, they do not fall within the scope of section 171.106(f) and the gross proceeds of the sale of those securities could not be considered gross receipts for purposes of Conagra's apportionment calculation.

After this Court issued its opinion in *Citgo Petroleum*, Conagra filed a reply brief in which it asserted that *Citgo Petroleum*'s holding does not apply to the particular type of non-inventory securities at issue here. Conagra maintains that its non-inventory securities "are, in

---

[3] The present appeal was pending before this Court when we issued our opinion in *Citgo Petroleum Corp. v. Hegar*, 636 S.W.3d 281, 289 (Tex. App.—Austin 2021, pet. filed). When the *Citgo Petroleum* opinion was issued, Conagra had already filed its appellant's brief but had yet to file a reply brief. Conagra's reply brief was filed after the *Citgo* opinion was issued.

7

substance, inventory" because it "used the commodity hedges to manage the cost of the raw materials it used to manufacture the products ultimately sold" and that "[t]he relationship between the raw materials and the commodity hedges is such that the commodity hedges are, in substance, a substitute for the raw materials." But the trial court found, and Conagra does not dispute, that the non-inventory securities are not "merchandise, stock in trade, raw materials, works in process, finished products, or supplies that are physically a part of the food products Conagra sold to its customers." This unchallenged finding forecloses any argument that they are "in substance" a "substitute" for the raw materials that do constitute Conagra's inventory for federal income tax purposes.

Nevertheless, Conagra asserts that in *Corn Products Refining Co. v. Commissioner of Internal Revenue*, 350 U.S. 46 (1955), the United States Supreme Court "determined that inventory hedges are, in substance, inventory." In *Corn Products*, the Supreme Court considered whether Corn Products Refining Company, a manufacturer of products made from grain corn, could report income and losses from its sales of corn futures as ordinary, which turned on whether or not the corn futures were "capital assets." After droughts in the corn belt in 1934 and 1936 caused sharp increases in the price of spot corn, Corn Products, which had limited corn storage capacity, found itself unable to buy corn at a price that would permit it to produce and sell its refined corn sugar at a price that could compete successfully with cane and beet sugar. *Corn Products*, 350 U.S. at 48. To address this problem, Corn Products began to establish long positions in corn futures "as a part of its corn buying program" and "as the most economical method of obtaining an adequate supply of raw corn" without having to make large expenditures for additional storage facilities. *Id.* Corn Products took the position that its corn futures were "capital assets" under the then-applicable version of the Internal Revenue Code and

that its gains and losses should be treated as arising from the sale of a capital asset rather than as ordinary profit and loss from its manufacturing operations. *Id.* at 49. Corn Products argued that the corn futures were "property" entitled to capital-asset treatment and, as such, were distinct from its manufacturing business. *Id.* at 50. The Supreme Court held that nothing in the record supported Corn Products's assertion that its "futures activity was separate and apart from its manufacturing operation." *Id.* The Court observed that "it appears that the transactions were vitally important to the company's business as a form of insurance against increases in the price of raw corn." *Id.* Thus, the Court stated that it was "difficult to imagine a program more closely geared to a company's manufacturing enterprise or more important to its successful operation" than Corn Products's corn futures program. *Id.*

We do not agree with Conagra that the Court held that inventory hedges are, "in substance" a "substitute" for raw materials. In fact, the Court stated that the corn futures "were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business." *Id*. at 51. Instead, the Court held that even though the corn futures did not constitute inventory, the purchases and sales of corn futures were not capital-asset transactions for purposes of the Internal Revenue Code and Corn Products was required to report its gains and losses as ordinary, like gains and losses from inventory sales. Thus, *Corn Products* stood for the proposition that the inventory hedges, because they were an integral part of the manufacturing process, were not entitled to capital-asset treatment under the Internal Revenue Code. The Supreme Court later summarized the *Corn Products* holding, stating: "We conclude that *Corn Products* is properly interpreted as standing for the narrow proposition that hedging transactions that are an integral part of a business's inventory-purchase system fall within the inventory exclusion of [Internal Revenue Code] § 1221." *See Arkansas Best Corp. v.*

9

*Commissioner of Internal Revenue*, 485 U.S. 212, 221-22 (1988). The narrow holding that inventory hedges should not receive capital-asset tax treatment because they fall within the ambit of the Internal Revenue Code's section 1221 inventory exclusion does not constitute a broader holding by the Court that inventory hedges *are*, actually or "in substance," a seller's inventory or a substitute therefor. *See id.* at 223 (interpreting *Corn Products* as involving "a broad reading of the inventory exclusion of § 1221").

To the extent that Conagra argues that the Supreme Court's holding that inventory hedges fall within the section 1221 inventory exclusion such that they are taxed in a manner consistent with inventory—i.e., as ordinary rather than capital—means that the inventory hedges constitute Conagra's inventory or are "treated as inventory of the seller" for federal income tax purposes, we note that Congress has supplanted the *Corn Products* and *Arkansas Best* rationale for giving ordinary tax treatment to gains and losses from hedging activities, whether or not they constitute inventory hedges. In 1999, Congress amended Internal Revenue Code section 1221 to expressly exclude hedging transactions from the definition of "capital asset." *See* 26 U.S.C. § 1221(a)(7) (providing that term "capital asset" does not include "any hedging transaction which is clearly identified as such before the close of the day on which it was acquired, originated, or entered into"). Related Treasury Department regulations provide that gains or losses from hedging transactions are "not made ordinary on the grounds that the property involved in the transaction is a surrogate for a noncapital asset" or "that the transaction serves as insurance against a business risk." *See* 26 C.F.R. § 1.1221-2(a)(3). In effect, Congress eliminated the *Corn Products* and *Arkansas Best* rationale for treating hedging transactions as ordinary through the inventory exclusion in section 1221(a)(1). Rather gains and losses from inventory hedges, like all other hedges, are treated as ordinary by virtue of separate provision in

the Internal Revenue Code—section 1221(a)(7). Thus, as early as 1999, all hedging transactions, including transactions like the non-inventory securities at issue in this case, were treated as non-capital assets with ordinary tax treatment by virtue of Internal Revenue Code section 1221(a)(7) rather than by virtue of the inventory exclusion of section 1221(a)(1) or by the Supreme Court's analysis in *Corn Products* or *Arkansas Best*. Likewise, by the time the Texas Legislature amended the Texas Tax Code to add section 171.106(f) in 2008, gains and losses from transactions like the non-inventory securities at issue in this case did not receive ordinary tax treatment through the inventory exclusion in section 1221(a)(1) but through the separate exclusion codified in section 1221(a)(7). Despite Conagra's reliance on the Supreme Court's analysis in *Corn Products* and *Arkansas Best*, it is clear that because of Congress's amendment to the Internal Revenue Code, inventory hedges, along with any other type of hedging transaction, were not treated as "inventory" for federal income tax purposes, but as a separate type of non-capital asset that obtained ordinary tax treatment through a separate section of the Internal Revenue Code.

We hold that because the non-inventory securities at issue in this case are not "treated as inventory of the seller" for federal tax purposes but, rather, simply receive similar "tax treatment" under a specific, and separate, provision of the Internal Revenue Code, they do not fall within the scope of section 171.106(f), and the trial court properly concluded that the gross proceeds of the sale of those securities could not be considered gross receipts for purposes of Conagra's apportionment factor.

## CONCLUSION

For the reasons stated in this opinion, we affirm the trial court's judgment.

11

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed:   August 24, 2022